AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of C~~a~~

| | |
|---|---|
| United States of America | |
| v. | |
| ANTHONY FARRER, aka "The Timepiece Gentleman," | |
| Defendant(s) | |

**FILED**
CLERK, U.S. DISTRICT COURT

11/06/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CGM _____ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

11/6/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ D _____ DEPUTY

Case No.   2:23-mj-05738-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 7, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Justin Palmerton
*Complainant's signature*

Justin Palmerton, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   November 6, 2023

*Judge's signature*

City and state:   Los Angeles, California

Hon. A. Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Justin Palmerton, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed since January 2018. I am currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating complex financial crimes. Prior to being employed by the FBI as a Special Agent, I was employed as a Certified Public Accountant at a public accounting firm. My roles and responsibilities included financial statement audits, tax return preparation and accounting consulting work.

2.      Since becoming an FBI Special Agent in 2018, I have received 21 weeks of formal training at the FBI Training Academy in Quantico, Virginia. During the time I have been employed by the FBI, I have participated in investigations relating to wire fraud, mail fraud, and various types of complex financial crimes. I have participated in many aspects of criminal investigations, including reviewing evidence, analyzing financial documents, conducting physical and electronic surveillance, working with informants, and executing search and arrest warrants.

## II.   PURPOSE OF AFFIDAVIT

3.      This affidavit is made in support of a criminal complaint against, and arrest warrant for, ANTHONY FARRER ("FARRER") for wire fraud, in violation of 18 U.S.C. § 1343.

4.      This affidavit is also in support of an application for a warrant to search FARRER, as described in Attachment A-1, and FARRER's storage unit, described in Attachment A-2, for evidence of violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud) (the "Subject Offenses"), as described in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

5.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.   STATEMENT OF PROBABLE CAUSE

6.      Based on my review of law enforcement reports, conversations with other law enforcement officers, any my own participation in this investigation, I know the following:

**A.      Summary Of Investigation And Fraudulent Scheme**

7.      FARRER founded a company called GENTLEMEN TIMEPIECES in Texas in 2017. FARRER used this company to connect purchasers and sellers of high-end watches. FARRER would typically collect a watch from an individual and have them sign a consignment agreement. This agreement generally provided that FARRER would sell the watch for the individual and collect a commission, commonly 5%. In or about February 2022, FARRER moved to Los Angeles and opened a store to continue selling and consigning watches. On February 4, 2022, FARRER registered a company called THE TIMEPIECE GENTLEMAN ("TPG") with the state of California.

8.      Beginning no later than around November 2022 and continuing through at least August 3, 2023, ANTHONY FARRER, also known as "The Timepiece Gentleman," has defrauded victims into providing their luxury watches to FARRER and his associates by promising to sell the watches on consignment and remitting the funds back to the owner, less a sales fee, once the watch is sold. Rather than selling the watches and remitting the funds back to the watch owners, FARRER appears to instead sell the watches and keep the proceeds for himself.

9.      FARRER also induced victims into wiring funds for the purchase of luxury watches under the guise that he would purchase watches for them. Instead, FARRER would either never purchase the agreed upon watch or FARRER would send a completely different watch in lieu of the one agreed upon. FARRER has made recent public statements on social

media admitting to being millions of dollars in debt and owing clients money for watches he sold.

10.     Law enforcement has been contacted by numerous victims that either wired funds to FARRER for the purchase of a watch or mailed him watches to consign for sale. Many of these victims who sent their watches to FARRER to sell on consignment were never paid by FARRER for the sale and never received their watches back. One victim received a Rolex watch from FARRER in lieu of money FARRER owed; however, this Rolex watch belonged to another victim that did not authorize FARRER to use the watch as payment for FARRER's debts to other victims.

11.     Law enforcement has interviewed over 20 victims and has learned that due to FARRER's fraud scheme, the total victim losses to date are approximately $3,000,000.  Law enforcement is in the process of identifying and interviewing additional victims of FARRER's fraudulent scheme.

12.     On August 3, 2023, law enforcement visited FARRER's TPG storefront location in Beverly Hills and determined that the business appeared to no longer be in operation. Building security relayed to law enforcement that no one had been in the TPG suite in the past week and the doorbell camera was ripped off. Around this same time, FARRER had been posting on social media, and based on those posts, he appears to have been travelling to various locations including South Carolina, Colorado, Texas, and Florida.

13.     Cell site information for a cellular telephone subscribed to "The Timepiece Gentleman" and believed to be used by FARRER, indicated that FARRER has recently travelled frequently, including between California, Texas, Colorado, Arizona, and Nevada.

14.     While travelling to these various locations, and as recently as October 6, 2023, FARRER continues to advertise watches for sale on his social media platforms.

**B.     FARRER Operates A Fraudulent Scheme That Induces Victims To Part With Funds Or Luxury Watches**

15.     Based on investigation to date, FARRER appears to be operating a fraudulent scheme whereby he would take possession of luxury watches on behalf of victims, agree to sell the watches for the victims in return for a commission, then ultimately sell or trade the watches for his own benefit without remitting payment to the victims of the scheme. The scheme operates in a similar manner to a Ponzi scheme. FARRER will lull victims into a sense of security by engaging in smaller successful transactions prior to requesting or engaging in significantly larger transactions.

16.     Based on interviews and review of records, law enforcement learned the following:

1.     Victim B.S.

a.     Law enforcement interviewed a victim identified as "B.S." B.S. contacted FARRER on or about February 2023 to purchase a watch for approximately $20,000.

b.     According to B.S., B.S. wired FARRER $20,000 and received the luxury watch. Because that transaction was successful, B.S. felt comfortable sending FARRER approximately $50,000 for another watch. This purchase was also successful. B.S. therefore decided to consign an $85,000 watch for sale with FARRER and felt that FARRER was actually becoming a good friend. Instead of wiring B.S. proceeds of the sale of his watch, FARRER offered to provide another watch to B.S. worth approximately $76,000 and give B.S. a $9,000 credit to be used to purchase another watch from FARRER. After these transactions, B.S. decided to consign an additional two luxury watches with FARRER that were collectively valued at approximately $220,000. I reviewed text messages between B.S., who lives in Arizona, and FARRER, who lives in California, and learned that at different times on July 7, 2023, B.S. shipped a Patek Phillipe and a Rolex Skydweller via FedEx from Tempe, Arizona to Beverly Hills, California for FARRER to sell the watches on consignment for B.S. In the text messages, FARRER sent messages to B.S. that included FedEx shipping labels for B.S. to send the Patek

Phillipe and the Rolex Skydweller to FARRER. On July 7, 2023, B.S. sent a text message to FARRER stating, "Send label for sky dweller," to which FARRER responded by texting B.S. a FedEx shipping label. Later that day, B.S. confirmed that he had shipped the Rolex Skydweller by sending FARRER a screen shot of the FedEx receipt. FARRER acknowledged receiving the Patek Phillipe on July 8, 2023, and subsequently the Rolex Skydweller on July 10, 2023. On July 16, 2023, B.S. asked FARRER if there was any prospective buyer interest in the watches to which FARRER responded "Have a buyer coming to look at the Patek. It's about a 90% chance it's a done deal." On July 18, 2023, FARRER told B.S. the Rolex Skydweller had been sold for $70,000 and on July 20, 2023, FARRER told B.S. that the Patek Phillipe had also been sold. Instead of selling the watches and paying the owners of the watches the sale proceeds, however, FARRER claimed that he had been robbed and would not be able to pay B.S. FARRER offered to send B.S. a watch as partial payment for what FARRER owed B.S. B.S. received a Rolex watch from FARRER as the partial payment; however, B.S. believed it was likely that the watch he received was actually a watch that belonged to another victim.  Based on additional evidence discussed below, I believe that the Rolex provided to B.S. was actually a lulling payment to B.S. because that Rolex was later determined to in fact belong to another victim who had also given the Rolex to FARRER to sell on consignment.

              i.      I interviewed a prior TPG employee on August 11, 2023. The former employee left TPG on July 25, 2023. Prior to leaving, the former employee downloaded a copy of an excel spreadsheet FARRER used to track TPG's inventory of watches. I reviewed the internal TPG business records that included this excel spreadsheet titled "New Inventory Sku TPG – 2023" provided by the former employee. On the spreadsheet, there is a Patek Phillipe Nautilus 5980R identified as having been consigned by B.S. on July 7, 2023. There is a notation on the spreadsheet that the watch was sold and not, contrary to what FARRER claimed to various victims, including B.S., stolen. Also on the spreadsheet, there is a Rolex Skydweller

notated as consigned by B.S. on July 10, 2023, which includes a notation that the transaction was "Complete," as opposed to any indication that the watch was stolen.[1]

    2.   <u>Victim F.L.</u>

    c.   Law enforcement interviewed a victim identified as "F.L" and learned that F.L. had consigned a Rolex watch with FARRER. I reviewed text messages between FARRER and F.L., and FedEx receipts provided by F.L., and learned that F.L. sent a Rolex Red-Letter SeaDweller watch to FARRER in July 2023. After sending the watch for consignment sale, F.L. did not hear from FARRER again.

    d.   F.L. later viewed a social media video posted by B.S. claiming to have received a Rolex Red-Letter SeaDweller from FARRER (as discussed above). After viewing this video, F.L. recognized the Rolex watch that B.S. had received from FARRER and thought it may actually have been F.L.'s own watch that F.L. had sent to FARRER for FARRER to sell on consignment. F.L. contacted B.S. and provided the serial number for the Rolex Red-Letter SeaDweller he had consigned with FARRER. That serial number matched the Rolex watch B.S. had received from FARRER. F.L. never authorized FARRER to use his Rolex watch as payment for FARRER's debts to other individuals.

    e.   Additionally, I reviewed a signed consignment agreement between F.L. and TPG (signed by FARRER). The consignment agreement, among other things, provided that "Consignee agrees to leave the merchandise in the vault of The Timepiece Gentleman . . ." Rather than keeping F.L.'s Rolex Red-Letter SeaDweller in TPG's vault, as required by the consignment agreement, FARRER sent F.L.'s watch to B.S. as a lulling payment in furtherance of the fraudulent scheme, and as payment of FARRER's debt to B.S.

---

[1] I have viewed a YouTube video posted by FARRER on August 2, 2023 titled "I've Finally Hit ROCK BOTTOM *** $5 Million In Debt ***" in which FARRER admitted to lying about the robbery. The video, posted on August 2, 2023, is available at: https://www.youtube.com/watch?v=mKLFcjm83vY.

3.    Victim W.S.

f.    Law enforcement interviewed a victim known as "W.S." W.S. relayed to law enforcement that he saw FARRER on social media and decided he would purchase watches from FARRER. W.S. purchased a handful of watches from FARRER over time, before deciding to consign three of W.S.'s own Rolex watches with FARRER. W.S. reported having no issues with any of these transactions.

g.    W.S. later decided to start his own watch reselling business. W.S. worked with FARRER to sell watches and would often also provide FARRER watches to consign. W.S. stated that FARRER appeared to sell watches quickly and would sell watches for more than they were worth.

h.    Around July 15, 2023, W.S. consigned approximately 75 watches to FARRER for FARRER to sell on behalf of W.S. W.S. expected weekly payments from FARRER as the consigned watches were sold. I reviewed text messages between W.S. and FARRER and saw photographs of FARRER unboxing 75 watches from three large FedEx boxes that FARRER received from W.S. I also reviewed records provided by W.S. and saw that the approximate value for these watches was $3.2 million.

i.    Based on my review of bank records for two accounts belonging to TPG, for which FARRER is the signatory, it appears that between July 17, 2023 and July 31, 2023, FARRER wired approximately $384,757.50 in seven different installments, to an account belonging to W.S.'s business.  According to W.S., these payments represented partial payments for the sale of 24 watches. However, according to W.S., the collective value of these 24 watches should have been approximately $987,650.

j.    W.S. also later discovered that FARRER had used five of W.S.'s 75 watches as collateral for a $300,000 loan FARRER had obtained on his own behalf. W.S. did not authorize FARRER to use any of his watches as loan collateral, nor did W.S. authorize FARRER to give custody of W.S.'s watches to the lender as collateral for FARRER's loan. In order to regain custody of the five watches from the lender, W.S. paid the lender $314,000 ($300,000

plus $14,000 in interest). According to W.S., the losses to W.S. resulting from FARRER's fraud scheme amount to approximately $1,000,000.

         i.     I interviewed the lender, identified as A.S., who stated that they had loaned FARRER $300,000 and took custody of the five watches as collateral. A.S. provided that FARRER claimed he owned the watches. A.S. released the watches to W.S. after receiving W.S's payment of $314,000.

17.    Based on investigation and reports from victims, including the three victims referenced above, to date, losses from FARRER's fraud scheme appear to currently be approximately $3,000,000. Law enforcement is, however, continuing to identify and interview additional victims and further losses resulting from FARRER's fraud scheme.

    C.    **TPG's Storefront Is Closed And FARRER Continues To Post On Social Media While Traveling[2]**

9.    On August 3, 2023, Beverly Hills Police Department ("BHPD") Detectives visited TPG's registered business location at 150 South Rodeo Drive, Suite 120, Beverly Hills, California 90212. BHPD observed that the doors were locked, the lights were off and the office space appeared empty. The camera doorbell had been ripped from its casing and a security guard interviewed by the BHPD detectives said that they had not seen anyone in that office space for approximately one week.

10.    FARRER has recently been active on social media, posting videos that at times appear to describe his location. On August 4, 2023, FARRER contacted victim W.S. and attempted to approach W.S. at his home in South Carolina. Two days later, on August 6, 2023, FARRER posted a video on social media that indicated he was in Dallas, Texas. On August 8, 2023, FARRER posted another video that indicated he was in Florida but would be travelling to Los Angeles for the weekend.

---

[2] Based on my review of records, I understand that in addition to FARRER's domestic travel within the United States discussed below, FARRER also recently applied for, and was issued, a United States Passport on September 20, 2023.

11.    Since August 1, 2023, FARRER has traveled to multiple cities while recording and uploading videos to YouTube, as well as posting Instagram stories. On or around August 5, 2023, FARRER posted a YouTube video titled "Road To Redemption: Day 2 - $4,992,000 In Debt,"[3] which I viewed. In this video, a sign in the background had "Young's" written on it. When researching Young's, I discovered it appears to be a store that sells Carolina's best pecans and other specialty food gifts. This video appears to place FARRER in South Carolina, corroborated by the interview with victim W.S.

12.    On or around August 6, 2023, FARRER uploaded an Instagram story in which he was working out and tagged "Katy Trail," a popular trail in the Dallas area.

13.    On or around August 8, 2023, FARRER uploaded a video, since deleted, documenting Day 5 of his "Road to Redemption." I viewed this video prior to FARRER deleting it, and in the video, he stated he was in Florida for a new business opportunity. In the background of some of the video, was a sign for "Koosh Jewelers." Based on my internet research, Koosh Jewelers is located in Hollywood, Florida.

14.    On August 10, 2023, I and another FBI Special Agent visited FARRER's last known residential address located at 101 California Avenue, Santa Monica, California, which was a multi-level residential complex. We interviewed the property manager and learned that FARRER was renting a unit in the building had not been seen in approximately one week. The property manager provided that FARRER drove a red Lamborghini. We were unable to locate the Lamborghini on the complex property, but we did identify two Ducati motorcycles that the property manager identified as also belonging to FARRER. On August 14, 2023, the property manager relayed that FARRER was seen entering the complex at approximately 1:00 A.M. the morning of August 11, 2023, and leaving that same morning at approximately 10:40 A.M. FARRER has not been seen at the building since August 11, 2023, and the two Ducati motorcycles are no longer parked at the property.

---

[3] Available at: https://www.youtube.com/watch?v=rZ0_DirDYrY.

9

15.     Since at least August 17, 2023, and upon reviewing the prospective location data for FARRER's cellular telephone[4] I learned that FARRER travelled to and from Los Angeles, California and Dallas, Texas numerous times. Specifically, from August 17, to at least October 25, 2023, FARRER travelled between these locations at least six times. More recently FARRER has also travelled to Las Vegas, Nevada and Denver, Colorado.

16.     I also reviewed financial reports from a casino in Las Vegas, Nevada and learned that on September 23, 202 FARRER purchased $14,000 of casino chips and subsequently redeemed $18,750 in cash. The next day, FARRER purchased $19,100 in casino chips with no subsequent withdrawal.

17.     As of October 26, 2023, FARRER was in Los Angeles, California and had been since at least October 25, 2023.

D.     **FARRER Admits On Social Media To Using Other People's Money To Fund His Lifestyle**

18.     I viewed a YouTube video posted by FARRER on August 2, 2023 titled "I've Finally Hit ROCK BOTTOM *** $5 Million In Debt ***."[5] This video is 14 minutes and 18 seconds long and includes a written summary text included with the video that states FARRER is a drug addict, has a gambling problem, and a spending problem. FARRER also wrote in the statement that he "betrayed people's trust that were close to me. I have taken advantage of people. I have hurt people... I am a fraud. I owe a lot of people a lot of money."

19.     In the YouTube video, FARRER is sitting and talking to the camera with what appears to be a kitchen behind him. I know that this is FARRER in the video because I have reviewed information from the Texas Department of Motor Vehicles ("DMV"), which included

---

[4] On August 17, 2023, I obtained an order from the Honorable Brianna Fuller Mircheff, for cell-site and location data for FARRER's phone.  See 2-23-MJ-04209. On September 27, 2023, I obtained a renewed order for cell-site and location data for the same phone from the Honorable Steve Kim. See 2-23-MJ-04209.

[5] Anthony Farrer has a public YouTube page titled Anthony Farrer. Farrar has 88.6K subscribers. The video posted on August 2, 2023 is available at: https://www.youtube.com/watch?v=mKLFcjm83vY.

FARRER's Texas Driver's License, Driver's License number 23344078, and based on comparison of the DMV picture to the person in the video, it is the same individual.[6]

20.     During the video, FARRER admitted to a "look at me" lifestyle and trying to keep up appearances. FARRER admitted the "stuff" he did was wrong and "spending people's money. You know, living above my means. Living this flex lifestyle. All that stuff was wrong."

21.     FARRER ultimately stated in the video that he had been digging himself in a hole and that the hole is $5 million. FARRER used the term "debt" to describe the loss amount he owes people. FARRER stated "Yes, it is true. I'm $5 million in debt."

22.     FARRER also discussed someone who acted as an investor into his business and stated, "and I used his money to fund my lifestyle."

E.     **FARRER Admits On Social Media To Owing People Money For Watches**

23.     In the same YouTube video posted by FARRER that I viewed, FARRER admitted to lies and deception. FARRER also admitted to controlling the money and the books of TPG and said that his team did not know anything about "this."

24.     After FARRER stated he was $5 million in "debt," he clarified that two clients made up $3 million of that total amount, and that he owed a lot of "small people" a collective $2 million. FARRER added that he owed these "small people" for watches that he sold.

25.     FARRER also stated that he lied to people, abused people's trust, and used his reputation to manipulate and take advantage of people.

---

[6] I also know the person in the video to be FARRER because I previously interviewed FARRER in or around June 2021 as part of another separate investigation in which FARRER was a witness. At that time, we confirmed his identity via his Driver's License, and FARRER ultimately testified at trial.

F.      **FARRER Admits On Social Media To "Robbing Peter To Pay Paul"**

26.     On or around August 1, 2023, victim B.S. posted a recorded call between victim B.S. and FARRER on Reddit.[7] I viewed this video in addition to conducting an interview with victim B.S.

27.     In this two minute and 51 second recorded call, FARRER explained to victim B.S. that he needed time to fix things and if FARRER could put a "stop to it" for one month, he could continue to sell watches and make profit and start to make a dent in the "debt" that he owes. FARRER went on to say that if he could continue his business for six months, he could show he put the debt aside, had changed the way he operated, and he "no longer robs Peter to pay Paul."

G.      **FARRER Sends A Text Message To Victims Admitting To A Cover Up**

28.     On or around August 1, 2023, FARRER sent out a text message to many of his victims in an attempt to explain his situation. I reviewed a copy of this text message that I obtained from a victim.

29.     FARRER started the message stating he could no longer live behind the lies and his mistakes. In this text, FARRER claimed that he had lost a Richard Mille watch several months ago along with misplacing a bag that contained about $2 million in watches, including consigned inventory. FARRER claimed to have kept this theft hidden in order to dig himself out of the hole created by the lost inventory.

30.     FARRER said that he did not think the rules applied to him. He admitted to betraying the trust of his client and that he owed the client money.

31.     FARRER does not appear to explicitly identify what "the situation" is he is referring to. Nor does FARRER explicitly state what he is apologizing for. FARRER continued

---

[7] Reddit is a social media platform where users can form and/or join forums to discuss topics of interest. Victim B.S. posted to a thread related to The Timepiece Gentleman, which is available at:
https://www.reddit.com/r/TheTpGentleman/comments/15fych9/anthony_farrer_part_2_admits_stealing_5_million/.

the text with an apology for "doing what I did," but stated that he kept trying to "cover it up by selling more inventory to pay people slowly."

32.     FARRER admitted in this text message that he owed them (the victims who received the text message) money for watches they had on consignment with FARRER. FARRER also admitted to not having the money to pay the victims back.

33.     W.S. relayed to law enforcement that FARRER's claim that he had lost $2 million in watches was false. FARRER had told W.S. that he only included this statement to keep some of his larger clients from taking legal action. I reviewed text messages between W.S. and FARRER and observed a message that FARRER sent to his various clients and creditors. Among other claims in the text message, FARRER stated in this message to his clients that "My bag that I misplaced contained about $2 million in inventory. Majority of which was on consignment with clients like you." In response to FARRER's text message, W.S. wrote "I'm proud you're taking responsibility for most of it. Would have made me feel a little better if you didn't make up the stuff about loosing [sic] the 2 million in jewelry."

H.     **FARRER Continues To Sell Watches**

34.     FARRER has four Instagram accounts: @Anthony, @Anthonywfarrer, @thetimepiecegentleman, and @thetimepiece_gentleman.

35.     On August 8, 2023, I viewed the Instagram story for the account @Anthonywfarrer. On this account, FARRER was still attempting to sell watches. FARRER did not indicate whether these watches were on consignment, or who the owners of the watches were.

        a.     At the time I viewed the account, there were six watches for sale posted on Instagram stories. It appeared that all of the watches were Rolexes.

        b.     For one of the watches, FARRER included a picture of the paperwork along with the watch. However, the serial number to the watch had been blacked out.

        c.     Based on my interviews of victims, I know that some victims have been able to identify and locate their watches that had been sold or traded by FARRER to other people

based on a new owner posting the watch to social media with the serial number visible. The victims then attempted to contact FARRER and tell him that they have found their watch in someone else's possession based on the serial number. Therefore, I believe FARRER is aware that victims are able to identify their stolen watches by serial number in social media postings, and that FARRER may therefore be attempting to continue to sell stolen watches and further cover up his crimes by blocking out serial numbers in more recent social media and advertising posts.

36.     On October 6, 2023, law enforcement viewed an Instagram post on the @timepiece_gentleman account and observed FARRER attempting to sell six Rolex watches for a total of $149,000. Of the six watches posted, FARRER only provided the serial number for one watch.

37.     On October 2, 2023, Victim W.S. provided that FARRER was still dealing in watches utilizing "DealerChat," a WhatsApp marketplace where watch dealers can sell or buy luxury watches. W.S. stated to law enforcement that he had seen FARRER posting watches on DealerChat at least as of September 8, 2023. Additionally, based on a Los Angeles Times article published October 2, 2023,[8] it appears that FARRER was interviewed and stated that he "…still continues to sell watches on the side…."

I.     Identification Of FARRER's Storage Unit

38.     On or about November 1, 2023, I and another FBI Special Agent observed FARRER at Dogtown Coffee located in Santa Monica, California. FARRER was working on a laptop that was observed being put into a backpack and also wrote in a black journal that was also put inside the backpack. FARRER left Dogtown Coffee wearing a backpack and headed south on a Ducati Panigale motorcycle with no observable license plate. We later identified the Ducati within a Public Storage facility located in Venice, California. We observed FARRER outside of a unit, putting something inside of the backpack, putting the backpack on, and then

---

[8] Available at: https://www.latimes.com/california/story/2023-10-02/timepiece-gentlemen-anthony-farrer-luxury-watch-rolex.

exiting the facility on the Ducati motorcycle. We later identified the Ducati parked in a metered parking spot on Wilshire Blvd. in Santa Monica, California between 10th Street and 11th Street. Another FBI Special Agent observed FARRER come out of a FedEx store, get on the Ducati and drive east on Wilshire Blvd.

39.     Based on my training and experience and knowledge of this investigation, I believe that FARRER continues to sell watches and that he has historically used FedEx to ship watches to clients. Because FARRER was at a storage unit for approximately five minutes and then drove to a FedEx location, I believe FARRER is storing watches and other evidence and fruits of his fraud scheme, in a unit at that Public Storage location.

40.     On or about November 2, 2023, I received documents from the District Manager of the Public Storage facility located in Venice, California. The District Manager confirmed FARRER rents unit number 1B003. FARRER rented the unit on August 11, 2023, and is current on his payments. The District Manager also stated that FARRER comes in often.

**J.     Training and Experience In Investigating Fraud Offenses**

41.     Based on my training and experience, and information from other experienced investigators of fraud offenses, I know the following:

a.     Typically, individuals involved in fraud schemes maintain evidence where it is close at hand and safe, such as on their persons or digital devices, or in their residences or vehicles. I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets, and cell phones are expensive items that are typically used for years before being upgraded or discarded. Digital devices can be used to communicate between co-conspirators and victims, and could contain information relating to the crimes under investigation. And, even when those who use digital devices to commit fraud do upgrade them, they often transfer data across devices, such as contact lists, email and text communications, and documentary records, such that they keep such items and records for long periods of time and on multiple digital devices.

b.      Individuals involved in fraud frequently keep the most damaging evidence and/or proceeds of the scheme close at hand to help conceal the fraud from third parties, such as associates who may have access to such documents at a shared workplace.

c.      More sophisticated fraudsters may rent public storage units, safe deposit boxes, or other third-party space to further distance themselves from incriminating evidence or to hide fruits, instrumentalities, or illicit profits of fraud schemes from law enforcement or civil litigants.

d.      The requested search warrant seeks not only to seize evidence of crimes but also the "fruits of crime" and "property designed for use, intended for use, or used in committing a crime." Fed. R. Crim. P. 41(c). Even long after a crime has been completed, the evidence of, and illicit proceeds of, a crime often still exist, frequently secreted in forms or locations difficult to detect by law enforcement.

## IV.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[9]

42.      Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.      Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they

---

[9] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.     The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.     Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

        43.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.     Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate

analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.     Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37.     The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.     Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.     In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress FARRER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of FARRER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

       d.     Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.   REQUEST FOR SEALING

44.    I request that the search warrant, search warrant application and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel. I make this request for the following reason:

       a.     First, this criminal investigation is ongoing and is neither public nor known to all of the subjects of the investigation. Disclosure of the search warrant, application, and this affidavit could cause FARRER and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

       b.     Second, there are victims listed in this application that have provided information to law enforcement. Making their names public could open them up to retaliation from the subjects of the investigation.

       c.     Third, the government is still attempting to locate additional documentary evidence that is relevant to the investigation, including emails and electronic records that may exist, both stored with FARRER and elsewhere. If alerted to the investigation prior to the execution of the proposed arrest and search warrant, it is possible FARRER and others would attempt to destroy such records and that the government would have no other means to obtain this evidence.

## VI.   CONCLUSION

45.    For all the reasons described above, there is probable cause to believe that FARRER has committed wire fraud, in violation of 18 U.S.C. § 1343.

46.    Further, there is probable cause that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a search of

FARRER, including any digital devices found on his person, as further described above and in

Attachment A-1, and in FARRER's storage unit, as further described above and in Attachment

A-2.

Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone
on this __6th__ day of November, 2020.

_____
 HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE